# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
### MACON DIVISION

| | |
|---|---|
| **LLOYD'S OF LONDON SYNDICATE NO. 2623,** | |
| *Plaintiff,* | **CIVIL ACTION NO.** |
| v. | **5:18-cv-00133-TES** |
| **NAVICENT HEALTH, INC.,** | |
| *Defendant.* | |

## ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

In the instant insurance dispute, Plaintiff Lloyd's of London Syndicate No. 2623 ("Lloyd's" or "Lloyd's of London") seeks summary judgment on its breach of contract and declaratory judgment claims against Defendant Navicent Health, Inc. ("Navicent") and on Navicent's counterclaim for bad faith. Navicent, in turn, seeks partial summary judgment on two of Plaintiff's claims. As explained below, Lloyd's of London's Motion for Summary Judgment [Doc. 55] is **GRANTED IN PART**, and Navicent's Partial Motion for Summary Judgment [Doc. 56] is **DENIED**.

## FACTUAL BACKGROUND

On May 1, 2015, a Navicent employee filed a qui tam action on behalf of the United States and the State of Georgia, alleging that Navicent knowingly submitted "false or fraudulent claims" in violation of the federal False Claims Act and the Georgia False Medicaid Claims Act. [Doc. 6, p. 1]. Specifically, the employee claimed Navicent illegally

billed Medicare and Medicaid programs for emergency transportation of patients who did not require it and for emergency transportation that was not made "as quickly as possible." [*Id.* at ¶¶ 20, 22].

As part of its investigation, the United States government issued Navicent a civil investigative demand requesting information pertinent to the claims. [Doc. 7]; [Doc. 61-1, ¶ 14]. Upon receiving a copy of the qui tam complaint and the civil investigative demand, Navicent forwarded the documents to Lloyd's of London, who had previously agreed to insure Navicent against expenses incurred as a result of "wrongful acts" committed between September 30, 2015, and September 30, 2016. [Doc. 4, pp. 2, 17]. Such "wrongful acts" included actual or allegedly erroneous requests for government reimbursement for medical services rendered by Navicent, provided that Navicent had no knowledge of the acts prior to September 30, 2012. [*Id.* at pp. 13, 26–27]; [Doc. 61-1, ¶¶ 2, 3, 15]. Navicent, who had been accused in the qui tam complaint of committing such a wrongful act, requested coverage under its insurance policy (the "Policy") with Lloyd's of London on September 16, 2016. [Doc. 61-1, ¶ 15].

Under the terms of the Policy, Navicent was required to "co-operate with [Lloyd's of London] in all investigations, including regarding the application and coverage under [the] Policy, . . . in all aspects of the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization." [Doc. 4, p. 29]. Additionally, Lloyd's of London had the right to "effectively associate with [Navicent] in

the investigation, defense and settlement of any Claim that appear[ed] reasonably likely to be covered" by the Policy and to "conduct any investigation [Lloyd's of London] deem[ed] necessary, including, without limitation, any investigation with respect to coverage." [*Id.* at pp. 18, 19].

During settlement negotiations between Navicent and the Government, the Government made a PowerPoint presentation related to Navicent's alleged False Claims Act violations and provided it to Navicent on September 14, 2016. [Doc. 61-1, ¶ 21]; [Doc. 55-4, Plaintiff's Ex. 42]. The Government's presentation focused on two issues: (1) Navicent's alleged improper billing for Medicare/Medicaid reimbursement of emergency transports to unauthorized locations, and (2) Navicent's alleged improper billing for Medicare/Medicaid reimbursement for transports billed as emergencies that were not, in fact, emergencies. [Doc. 61-1, ¶ 22]; [Doc. 55-4, Plaintiff's Ex. 42, p. 22].[1] On December 7, 2016, Navicent made its own presentation to the Government that focused solely on the first issue. [Doc. 61-1, ¶ 31]; [Doc. 55-5, Plaintiff's Ex. 44]; [Doc. 55-25, Brennan Depo., pp. 107:19—108:2, 108:24–25]. Navicent based its presentation in part on an independent and limited analysis conducted by FTI Consulting on behalf of Navicent's counsel. [Doc. 61-1, ¶ 31]; [Doc. 55-5, Plaintiff's Ex. 44, p. 6]; [Doc. 55-25, Brennan Depo., pp. 108:24—109:5].

---

[1] Lloyd's filed several documents under seal that are either paginated or Bates stamped, if numbered at all. Where page numbers or Bates stamps are present, the Court refers to those; where they are absent, the Court refers to the number the page would have had if it had been numbered sequentially from the first page of the document.

After exchanging presentations with the Government, Navicent called Lloyd's of London—who was not part of the settlement negotiations—on January 27, 2017, to discuss the qui tam complaint and Government investigation. [Doc. 61-1, ¶ 32]. At the end of the call, Lloyd's of London requested that Navicent provide it with the Government's presentation, Navicent's presentation, and the FTI Consulting limited analysis underlying Navicent's presentation. [*Id.* at ¶¶ 34, 36]. Lloyd's of London further requested to be informed of any information Navicent would learn in an upcoming meeting with the Government at the United States Attorney's Office in Macon, Georgia, on February 6, 2017. [*Id.*].

After meeting with the Government on February 6, Navicent sent a copy of both settlement presentations to Lloyd's of London and conducted a second telephone call with Lloyd's on February 14, 2017, to discuss the meeting. [*Id.* at ¶¶ 21, 31, 39]; [Doc. 63, ¶¶ 79, 80]. During the phone call, Lloyd's of London requested more documents from Navicent, including an overall analysis FTI Consulting performed of Navicent's emergency services line[2] and documents Navicent produced to the Government in 2016 in response to the civil investigative demand. [Doc. 61-1, ¶¶ 43, 44]. A few days after its

---

[2] It appears that FTI Consulting performed two analyses: one of a small, random sample of emergency billings to be used in Navicent's settlement discussions with the Government, and an overall compliance assessment of Navicent's entire emergency services line. It further appears that Lloyd's requested the results of both analyses.

second phone call with Navicent, Lloyd's also inquired into the status of the other documents it previously requested during its first phone call. [*Id.* at ¶ 45].

Lloyd's of London also followed up with a complete list of items it sought, including the previously requested civil investigative demand documents, notes from internal interviews Navicent conducted with key emergency services staff, and a "[c]opy of relevant portion[s] of any investigations or analyses performed by . . . consultants relating to the subject matter of" the qui tam action and the Government's investigation. [*Id.* at ¶ 47]; [Doc. 55-9, Plaintiff's Ex. 49, Bates 0005161–63]. In response, Navicent refused to submit certain civil investigative demand documents on the grounds that they were not provided to the Government in the underlying investigation. [*Id.* at Bates 0005159–60]. Navicent also explained that it would not transcribe handwritten notes of staff interviews because to do so would "take some time and expense" and be duplicative of summary interview memoranda already provided to Lloyd's. [*Id.* at Bates 0005160]. Navicent also refused to provide notes for its interviews of Kathleen Spears, a Navicent Compliance Department employee, on privilege grounds. [*Id.*]. Navicent acknowledged that the Government provided a memo regarding its own interviews of Navicent staff members, but without the Government's permission, Navicent could not distribute the memo to anyone but its own counsel. [*Id.*]. Finally, Navicent provided Lloyd's with three pages of FTI Consulting's findings presentation, including the cover page and the following heavily redacted "Call Objectives" slide.



[Doc. 61-1, ¶ 48]; [Doc. 55-10, Plaintiff's Ex. 49, Bates 0005164–66].

Navicent settled with the Government and the qui tam relator in August 2017. [Doc. 36-4]; [Doc. 63, ¶ 64]. It then demanded to be indemnified by Lloyd's of London for the total settlement amount and attorney's fees and expenses incurred in handling the qui tam action and the Government's investigation. [Doc. 55-21, Plaintiff's Ex. 85]. Throughout the ensuing insurance coverage discussions, Lloyd's continued to request documents from Navicent, only some of which were produced. Namely, on February 1, 2018, Lloyd's requested "any Navicent documents or communications dated prior to the continuity date of September 30, 2012 that discuss either the federal Medicare ambulance billing requirements or the MedUSA billing parameters for ambulance billing." [Doc. 55-

19, p. 4].[3] Navicent did not provide the requested information, arguing that it had already produced documents that were "more than sufficient to enable the Underwriters to conclude their investigation." [Doc. 61-1, ¶ 68]; [Doc. 55-20, pp. 4–5].

Lloyd's of London filed this lawsuit against Navicent on April 20, 2018, seeking two declaratory judgments. [Doc. 1]; [Doc. 26].[4] Lloyd's first requests a declaration that it has no obligation to cover Navicent's indemnification claim due to Navicent's alleged failure to provide the above-discussed documents. [Doc. 26, pp. 18–19]. Lloyd's also requests a declaration that it has no obligations under the Policy because Navicent allegedly breached the Policy's knowledge provision, which states, "[Lloyd's of London] will pay on behalf of the Insured Damages and Claims Expenses which the Insured shall become legally obligated to pay in respect of any Claim . . . [p]rovided always that the Insured had no knowledge of such Wrongful Act prior to the Continuity Date [September 30, 2012]." [Doc. 4, p. 17]. The "Insured" for purposes of the Policy includes Navicent and "any past present or future employee, director, officer, trustee, review board or

---

[3] According to the request, Lloyd's believed the emergency billing issues may have stemmed from MedUSA's billing parameters, which were not consistent with federal law. [Doc. 55-19, p. 3].

[4] The Court previously denied Lloyd's of London's motion for summary judgment on Count IV of the amended complaint, in which Lloyd's claims Navicent's settlement payments consisted of restitution payments not covered under the Policy. [Doc. 26, ¶¶ 68–71]; [Doc. 54]; *Lloyd's of London Syndicate No. 2623 v. Navicent Health, Inc.*, No. 5:18-cv-00133-TES, 2019 WL 2635590 (M.D. Ga. Apr. 25, 2019). At the hearing on the instant cross-motions for summary judgment, Lloyd's also unequivocally waived Counts II and III(b) of the amended complaint, which respectively seek damages for Navicent's alleged failure to cooperate and a declaration that Navicent's alleged wrongdoing consisted of two wrongful acts subject to two deductibles under the Policy. [Doc. 26, ¶¶ 56–64, 67(b)]; [Doc. 77, p. 3:3–25]. Thus, Plaintiff's only remaining claims to be discussed on summary judgment are Counts I (failure to cooperate) and Count III(a) (knowledge of the wrongful acts), which are the subjects of this Order. [*Id.* at ¶¶ 46–55, 67(a)].

committee member, or volunteer of [Navicent], but only while acting within the scope of that person's duties or capacity as such." [*Id.* at p. 26].

Lloyd's claims that Navicent's Clinical Educator, Kelly Joiner, who was responsible for training Navicent employees on how to code emergency services for Medicare and Medicaid purposes, sent an email evidencing knowledge in contravention of the Policy knowledge provision. [Doc. 55-27, Joiner Depo., pp. 17:10—18:1]; [Doc. 55-22, Plaintiff's Ex. 90]. In the email, dated February 1, 2012, Joiner indicated that she reviewed all ambulance transports spanning April 21 to November 23, 2011, which were all coded as emergencies because they originated from 9-1-1 calls, except a few that were not 9-1-1 calls but had an immediate ambulance dispatch. [Doc. 55-22, Plaintiff's Ex. 90]. Ten days later, Joiner requested to "meet again to discuss the coding process of the ambulance transports," given the "denials/redeterminations" the business department had received. [*Id.*]. This, according to Lloyd's, evidences "without question" Navicent's awareness before the Continuity Date "that its protocol of coding as emergenc[ies] all ambulance calls that were the result of a 911 call—the very Wrongful Acts alleged in [the qui tam complaint]—had been rejected by the Government . . . ." [Doc. 68, p. 23].

Both parties moved for summary judgment on these claims, and Lloyd's of London also moves for summary judgment on Navicent's counterclaim for bad faith under O.C.G.A. § 33-4-6,[5] claiming that it has reasonable grounds to contest Navicent's

---

[5] [Doc. 30, ¶¶ 53–62].

claim for indemnification under the Policy and therefore cannot have refused payment in bad faith. As discussed below, both parties' motions must be denied, with the exception of Lloyd's of London's motion on Navicent's bad faith claim.

## DISCUSSION

### A.   Standard of Review

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). As to issues for which the movant would bear the burden of proof at trial, the "movant must affirmatively show the absence of a genuine issue of material fact and support its motion with credible evidence demonstrating that no reasonable jury could find for the non-moving party on all of the essential elements of its case." *Landolfi v. City of Melbourne*, 515 F. App'x 832, 834 (11th Cir. 2013) (citing *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993)). As to issues for which the non-movant would bear the burden of proof at trial, the movant may (1) simply point out an absence of evidence to support the non-moving party's case or (2) provide "affirmative evidence demonstrating that the [non-movant] will be unable to prove its case at trial." *United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Ctys.*, 941 F.2d 1428, 1438 (11th Cir. 1991) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the movant satisfies its burden, the burden shifts to the non-movant, who must "go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact exists." *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006) (citing *Fitzpatrick*, 2 F.3d at 1115–17). "A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Four Parcels*, 941 F.2d at 1437 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, (1986)).

The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion. *See American Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005). "Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (internal quotation marks and citations omitted). The Court will consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration. *See American Bankers*, 408 F.3d at 1331. However, "[a] court need not permit a case to go to a jury . . . when the inferences that are drawn from the evidence, and upon which the non-movant relies, are implausible." *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 743 (11th Cir. 1996) (internal quotations omitted).

In insurance disputes under Georgia law, the burden first rests with the insured to show that its claim falls within the purview of the insurance policy. *Travelers Home &*

*Marine Ins. v. Castellanos*, 773 S.E.2d 184, 186 (Ga. 2015) (quoting *Castellanos v. Travelers Home & Marine Ins.*, 760 S.E.2d 226, 232 (Ga. Ct. App. 2014) (McMillian, J., dissenting)) ("[A]n insured claiming an insurance benefit has the burden of proving that a claim falls within the coverage of the policy."). Once the insured's burden is met, the burden shifts to the insurer to prove that a policy exclusion applies to the facts of the case. *Haulers Ins. v. Davenport*, 810 S.E.2d 617, 619 (Ga. Ct. App. 2018) (quoting *Interstate Life & Accident Ins. v. Wilmont*, 180 S.E.2d 913, 914 (Ga. Ct. App. 1971)) ("Where the insurer seeks to invoke an exclusion contained in its policy, it has the burden of proving the facts come within the exclusion.").

This Order focuses on the second part of this analysis, because Lloyd's argues policy exclusions apply to Navicent's claim for indemnification.[6] Because there are questions of fact that preclude the Court from determining whether the exclusions bar

---

[6] Lloyd's argues briefly that its second declaratory request (that Navicent had knowledge of wrongful acts prior to the Continuity Date) concerns a defense to coverage rather than a policy exclusion. *See* [Doc. 62, pp. 10–11]. But regardless of whether the Court construes the argument as a defense or an exclusion, Lloyd's bears the burden of proving its application at trial. *See Lawyers Title Ins. v. Stribling*, 670 S.E.2d 154, 157 (Ga. Ct. App. 2008) ("The burden is on the insurer to show that a loss or claim comes within an exception to coverage."). Lloyd's also conflates the burden of proof with the burden of persuasion in this case. Lloyd's bears the burden of persuasion on its coverage defenses, and this burden does not shift at any stage of the litigation to Navicent. *See Cement & Concrete Workers Dist. Council Pension Fund v. Ulico Cas. Co.*, 387 F. Supp. 2d 175, 189 (E.D.N.Y. 2005) ("It is axiomatic that while the burden of persuasion remains with the same party throughout a litigation, the burden of production may shift onto a non-movant on summary judgment even if that party does not bear the ultimate burden of persuasion at trial."). On summary judgment, however, the movant bears the burden of proof initially, and the burden shifts to the non-movant if the movant's burden is met. *See Porter*, 461 F.3d at 1320, *supra*. Thus, on its own motion for summary judgment, Navicent is not required to prove that an exception does not exist; Navicent will meet its burden if it merely "pokes holes" in the evidence Lloyd's presents. *Id.*

coverage as a matter of law, the Court must deny both parties' motions for summary

judgment on Lloyd's of London's cooperation and prior-knowledge defenses.

**B.    Navicent's Cooperation**

The parties first cross-move for summary judgment on Plaintiff's request for a

declaration that Navicent breached the Policy by failing to cooperate with Lloyd's of

London's requests for documents.

> Under Georgia law, an insured is required to provide any material
> information to the insurer that the insurer is entitled to receive under the
> insurance policy, and a failure to provide the requested information, absent
> an excusable failure to do so, constitutes a breach of the insurance contract
> that bars recovery by the insured.

*R&G Invs. & Holdings, LLC v. American Family Ins.*, 787 S.E.2d 765, 773 (Ga. Ct. App. 2016)

(cleaned up). This duty includes the obligation to "make a full, fair, complete, and

truthful disclosure of all facts relating to the [subject of the insurance claim]." *Southern*

*Mut. Ins. v. Mason*, 445 S.E.2d 569, 572 (Ga. Ct. App. 1994) (quoting *Hurston v. Georgia*

*Farm Bureau Mut. Ins.*, 250 S.E.2d 886, 888 (Ga. Ct. App. 1978)). An insured only breaches

this requirement if the information he refuses to provide is "material—not merely

technical or inconsequential in nature." *Id.* (quoting *St. Paul Fire & Marine Ins. v. Albany*

*Emergency Ctr., Inc.*, 361 S.E.2d 687, 689 (Ga. Ct. App. 1987)).

Where these elements are met and a breach occurs, an insurer's obligations under

its policy are relieved. "However, if there are factual questions regarding the degree of

the insured's compliance with the insurer's request for information or the reasonableness

of the insured's explanation for noncompliance, a jury must resolve whether the insured sufficiently cooperated with the insurer's request." *R&G Invs.*, 787 S.E.2d at 773; *see also Diamonds & Denims, Inc. v. First of Ga. Ins.*, 417 S.E.2d 440, 442 (Ga. Ct. App. 1992) ("If . . . the insured cooperates to some degree or provides an explanation for its noncompliance, a fact question is presented for resolution by a jury."). Summary judgment is also not appropriate if there is evidence establishing that the insurer failed to "act with diligence and good faith in securing the necessary information." *Diamonds & Denims*, 417 S.E.2d at 442.

Lloyd's lists six categories of documents it claims that Navicent has failed to produce:

1. Facts learned from FTI Consulting, a consultant engaged by Navicent, during its analysis of the ambulance billings at issue in the [qui tam complaint and Government investigation] which pre-dated the September 30, 2012 Continuity Date in the Policy;

2. Work Product of FTI Consulting both to study its ambulance practices and to recalculate an appropriate amount of repayment of overcharges, which Navicent's defense counsel, Parker Hudson, used to negotiate the settlement;

3. Interview notes by Navicent's defense counsel of Navicent key witnesses, including a memorandum provided to Navicent by the Government of interviews that it conducted with Navicent paramedics, taken in connection with Navicent's and the Government's . . . investigation;

4. Documents necessary for Underwriters to investigate what was known about Navicent's improper billing practices prior to September 30, 2012 (the Continuity Date in the Policy), which would either trigger coverage or result in non-coverage;

5. The basis for the multi-million-dollar settlement in the face of Navicent's denial of liability, and the amounts agreed to between Navicent and the Government . . . ; and

6. The specific documents that [Navicent General Counsel] Ken Banks testified Navicent would look at to determine its knowledge of its billing practices prior to September 30, 2012. (The failure of Navicent to produce these documents has unfairly prevented Underwriters from determining if additional documents establish that Navicent had knowledge of the subject and alleged Wrongful Acts with respect to the [qui tam complaint and Government investigation] prior to the Continuity Date in the Policy).

[Doc. 62, pp. 21–22].

As a point of law, Navicent argues that Lloyd's must show that it was prejudiced by Navicent's alleged failure to provide these documents by presenting "particularized evidence of harm." [Doc. 61, p. 17] (quoting *Plantation Pipe Line Co. v. Stonewall Ins.*, 780 S.E.2d 501, 512–13 (Ga Ct. App. 2015)). Navicent's reliance on *Plantation* is misplaced. There, an excess liability carrier refused to provide coverage under a policy it entered into with the plaintiff pipeline company, arguing that the company's three-year delay in notifying the carrier of the discovery of soil contamination violated the policy's notice provision. *Plantation*, 780 S.E.2d at 504. The Georgia Court of Appeals explained that an insurance policy's *notice* provision carries with it an obligation of reasonable promptness, and an insurer is required to prove that it has been prejudiced by a delay (i.e., by presenting "particularized evidence of harm") only if notice is not an express condition precedent to coverage. *Id.* at 510–13.

In this case, a notice provision is not at issue, and the Court of Appeals' prejudice analysis only makes sense in that context. In the context of cooperation, Georgia case law only requires that the failure to cooperate be material—a requirement that, in itself, evokes prejudice. That is, where an insurer requests information that is material to its investigation and the information is not provided by the insured, the mere materiality of the information makes the insured's noncompliance prejudicial. Thus, to the extent the information Lloyd's requested from Navicent is material (or, for that matter, in existence), Navicent's failure to produce it is prejudicial as a matter of law.

Navicent compellingly argues that the above categories of documents could not have been material to Lloyd's of London's coverage determination, because Lloyd's never moved to compel discovery of the documents during this litigation. Although Lloyd's is correct that Georgia law does not explicitly require insurers to resort to litigation and motion practice to receive necessary documentation, it does require that insurers exercise "diligence." *See Diamonds & Denims*, 417 S.E.2d at 442. There is evidence establishing that Lloyd's made multiple requests for the documents it seeks, but whether it went far enough to retrieve the documents is a question of reasonableness and degree—a question best suited for a jury. *See St. Paul Fire & Marine Ins. v. Gordon*, 158 S.E.2d 278, 280 (Ga. Ct. App. 1967) ("The question as to whether the [insurance] company was reasonably diligent in seeking to obtain information from the insured . . . is for resolution by the jury.").

The Court would reach the same result if it assumed that Lloyd's was reasonably diligent in obtaining the requested information. The evidence clearly establishes that Navicent cooperated to some degree with Lloyd's of London's requests, and there is evidence that Navicent had some explanation for the documents it did not produce, namely that the documents are either privileged or do not exist. Whether these explanations and Navicent's partial compliance were sufficient to satisfy Navicent's duty to cooperate are also questions for a jury. *See R&G Invs.*, 787 S.E.2d at 773; *see also Diamonds & Denims*, 417 S.E.2d at 442. Accordingly, the parties' cross-motions for summary judgment must be denied as to Count I of Lloyd's of London's amended complaint.

## C. <u>Navicent's Knowledge of the Wrongful Acts</u>

The Court must also defer to a jury with respect to Navicent's alleged knowledge of the wrongful acts prior to September 30, 2012. Under the terms of the Policy, Lloyd's had no duty to reimburse Navicent for expenses incurred as a result of wrongful acts of which Navicent had knowledge prior to the Continuity Date. The applicable provision states,

> The Underwriters will pay on behalf of the Insured Damages and Claims Expenses which the Insured shall become legally obligated to pay in respect of any Claim or Claims . . . arising out of any Wrongful Act . . . [p]rovided always that the Insured had no knowledge of such Wrongful Act prior to the Continuity Date specified in Item 3(a) of the Declarations [September 30, 2012].

[Doc. 4, p. 17].

Navicent first argues on summary judgment that "there is absolutely no evidence in the record that Navicent was fraudulently billing Medicare/Medicaid for ambulance trips." [Doc. 58, p. 16]. Thus, Navicent argues, Lloyd's "plainly cannot show that Navicent had knowledge of Wrongful Acts that have not been shown to have occurred," especially when Navicent's settlement agreement with the Government was not to be construed as an admission of liability. [*Id.* at p. 17]. But nothing in the Policy or Georgia law makes a proven illegal act a prerequisite to a prior-knowledge exclusion. A "wrongful act" is defined in the Policy as, among other things, "presenting, or causing or allowing to be presented, by an Insured any actual or *alleged* erroneous submission to a governmental health benefit program . . . seeking payment or reimbursement for Medical Services provided or prescribed by an Insured." [Doc. 4, pp. 26–27] (emphasis added). By explicitly including alleged erroneous billings within the purview of the Policy, Lloyd's preempted any duty it had to first prove that Navicent actually committed fraud in order to invoke the knowledge exclusion. It was enough that the Government's civil investigative demand concerned "allegations that Navicent Health, Inc., . . . submitted false claims for payment of ambulance services rendered" and that the qui tam complaint included allegations of Navicent's "knowing[ ] submission of false or fraudulent claims to the United States and the State of Georgia." [Doc. 6, p. 2]; [Doc. 7, p. 2]. Therefore, the question becomes whether Navicent had knowledge of actual or alleged erroneous

submissions for Medicare and Medicaid reimbursement prior to the Continuity Date—not whether Navicent actually submitted fraudulent billings.

In support of its knowledge defense, Lloyd's presents a single thread of emails from February 2012, in which Kelly Joiner, Navicent's Clinical Educator, requested to meet with business office employees to "discuss the coding process of the ambulance transports," given the "denials/redeterminations" Navicent had received. [Doc. 55-22, Plaintiff's Ex. 90].[7] As a preliminary matter, the parties dispute whether Joiner and the business office employees copied on the emails were members of Navicent's "upper management." Navicent argues that the prior-knowledge exclusion is only triggered when it can be shown that a senior Navicent official possessed the requisite knowledge. However, in addition to being nonbinding on the Court, the cases Navicent cites in support of this contention are inapposite. In both *HSB Group v. SVB Underwriting, Ltd.*, 664 F. Supp. 2d 158 (D. Conn. 2009), and *Petersen v. TIG Insurance*, No. 8:01CV308, 2002 WL 31413808 (D. Neb. Oct. 28, 2002), the prior-knowledge provisions at issue were limited to knowledge possessed by a certain subset of affiliates. In *HSB Group*, this subset included the insured's office of the general counsel and any of the insured's directors. 664

---

[7] Lloyd's also relies on the content of the Government's settlement negotiation presentation, in which the Government declares Navicent's ambulance billing procedures noncompliant. *See* [Doc. 55-4, Plaintiff's Ex. 42]. Although the contents of the presentation are hearsay and not considered in ruling on the parties' motions, the outcome of this Order would have been the same had the Court considered them. Likewise, Navicent relies on a report from the Office of the Inspector General to support its motion, *see* [Doc. 60-10], but the report is also hearsay, and the outcome of this Order would not have changed had the Court considered it.

F. Supp. 2d at 174. In *Petersen*, it included the insured company's partners, shareholders, and management committee members. 2002 WL 31413808, at *5.[8]

The knowledge provision in this Policy applies explicitly to the "Insured," which broadly encompasses Navicent Health, Inc. (the "Named Insured") and

> any past, present, or future employee, director, officer, trustee, review board or committee member, or volunteer of [Navicent Health, Inc.], but only while acting within the scope of that person's duties or capacity as such; and, in the event of the death, incapacity, or bankruptcy of any such person, the estate, heirs, legal representatives, or assigns of such person.

[Doc. 4, pp. 13, 26]. Unlike *HSB Group* and *Petersen*, the Policy contains no senior management threshold. The Policy's language is clear, and the Court will not inject limitations or exclusions that are not there. *See R&G Invs.*, 787 S.E.2d at 769 (quoting *Richards v. Hanover Ins.*, 299 S.E.2d 561, 563 (Ga. 1983)) ("In Georgia, insurance is a matter of contract, and the parties to an insurance policy are bound by its plain and unambiguous terms."). Accordingly, Kelly Joiner's status as a member of "upper management" is irrelevant to the Court's determination of whether Navicent had knowledge of actual or alleged erroneous Medicare and Medicaid billings.

All that remains, then, is for the Court to determine whether Navicent's knowledge (or lack thereof) of erroneous billings can be determined as a matter of law

---

[8] Although the knowledge provision in Petersen also encompassed the "Insured" (i.e., "[a]ny employee of the Named Insured who is not a lawyer"), the court interpreted the policy and found that the knowledge provision was not intended to cover low-level employees, given the provision's explicit reference to the knowledge of "partner[s], shareholder[s], or the Insured's management committee." 2002 WL 31413808, at *5–7.

from Joiner's email thread. In reviewing Joiner's emails, there can be no question that Joiner and the business office employees knew of some issue with Navicent's billing process given the denials and redeterminations they received. But a jury must bridge the gap between Navicent's clear knowledge of some issue and whether that knowledge was of erroneous billings.

Navicent contends that there is no evidence to support a finding that it committed fraud, but a wrongful act is defined in the Policy as simply an "erroneous submission" to a government payor for reimbursement of medical services Navicent rendered. [Doc. 4, pp. 26–27]. Although "erroneous" is not defined in the Policy, its ordinary definition evokes no intent or willfulness; an error is just a mistake, and it follows that an erroneous submission is just a mistaken one.[9] Taking all facts and inferences in Lloyd's of London's favor, a jury reviewing the emails could reasonably infer that Navicent's receipt of Medicaid and Medicare denials and redeterminations evidences mistaken billing. A jury could further find that by reviewing the denials and redeterminations, Navicent was aware of the mistake.

Taking the facts in the light most favorable to Navicent on the other hand, a jury could reasonably decline to infer mistaken billing and instead infer that the denials and

---

[9] *See Error*, Merriam-Webster Online Dictionary 2019, https://www.merriam-webster.com/dictionary/error (Oct. 1, 2019) ("something produced by mistake"). *Accord Erroneous*, Merriam-Webster Online Dictionary 2019, https://www.merriam-webster.com/dictionary/erroneous (Oct. 1, 2019) ("containing or characterized by error: mistaken").

redeterminations were caused by some other factor than erroneous billing. A reasonable jury could further find that Navicent had no knowledge of the cause of the denials and redeterminations, since that information is not clear from the face of the Joiner emails. Because both conclusions are reasonable given the evidence, summary judgment is improper on Lloyd's of London's prior-knowledge defense.

### D. <u>Navicent's Counterclaim for Bad Faith</u>

Finally, Lloyd's moves for summary judgment on Navicent's claim for bad faith under O.C.G.A. § 33-4-6, which states in pertinent part,

> In the event of a loss which is covered by a policy of insurance and the refusal of the insurer to pay the same within 60 days after a demand has been made by the holder of the policy and a finding has been made that such refusal was in bad faith, the insurer shall be liable to pay such holder, in addition to the loss, not more than 50 percent of the liability of the insurer for the loss or $5,000.00, whichever is greater, and all reasonable attorney's fees for the prosecution of the action against the insurer.

O.C.G.A. § 33-4-6(a).

To prevail under the statute, Navicent must prove "(1) that the claim is covered under the Policy; (2) that a demand for payment was made against the insurer within 60 days prior to filing suit; and (3) that the insurer's failure to pay was motivated by bad faith." *Philadelphia Indem. Ins. v. First Multiple Listing Servs., Inc.*, 173 F. Supp. 3d 1314, 1323–24 (N.D. Ga. 2016) (citing *Lawyers Title Ins. v. Griffin*, 691 S.E.2d 633, 636 (Ga. Ct. App. 2010)). The Georgia courts define "bad faith" as "any frivolous and unfounded refusal in law or in fact to pay according to the terms of the policy." *Amica Mut. Ins. v.*

*Sanders*, 779 S.E.2d 459, 463 (Ga. Ct. App. 2015) (quoting *King v. Atlanta Cas. Ins.*, 631 S.E.2d 786, 788 (Ga. Ct. App. 2006)). Although bad faith is ordinarily a question for the jury, summary judgment is appropriate "if the issue of liability is close" or if "there is a disputed question of fact or doubtful question of law." *Homick v. American Cas. Co.*, 433 S.E.2d 318, 318–19 (Ga. Ct. App. 1993).

As evidenced by the Court's above analysis, this case is a close one. There is no clear evidence to establish that Lloyd's of London's refusal to indemnify Navicent was frivolous or unfounded. Therefore, Lloyd's is entitled to summary judgment on Navicent's counterclaim for bad faith.

<u>CONCLUSION</u>

As explained above, fact questions remain that preclude the Court from granting summary judgment on Counts I and III(a) of Lloyd's of London's complaint, but Lloyd's is entitled to summary judgment on Navicent's bad faith counterclaim. Accordingly, the Court **GRANTS IN PART AND DENIES IN PART** Lloyd's of London's Motion for Summary Judgment [Doc. 55] and **DENIES** Navicent's Partial Motion for Summary Judgment [Doc. 56]. Counts I, III(a), and IV of Lloyd's of London's amended complaint, and Counts I and II of Navicent's counterclaim will proceed to trial.

**SO ORDERED**, this 3rd day of October, 2019.

s/Tilman E. Self, III
**TILMAN E. SELF, III, Judge**
**UNITED STATES DISTRICT COURT**